**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

DEBORAH TARPLEY,           §
                                    §

        *Plaintiff,*           §
                                    §

*versus*                    §         CIVIL ACTION NO. H-07-2354
                                    §

MICHAEL J. ASTRUE, Commissioner  §
of the Social Security Administration,   §
                                    §

        *Defendant.*        §

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Deborah Tarpley's ("Tarpley") and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration (the "Commissioner"), cross-motions for summary judgment. Tarpley appeals the determination of an Administrative Law Judge ("ALJ") that she is not entitled to receive Title II disability insurance benefits or Title XVI supplemental security income ("SSI") benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, it is ordered that Tarpley's Motion for Summary Judgment (Docket Entry No. 16) is granted, the Commissioner's Motion for Summary Judgment (Docket Entry No. 17) is denied, and the Commissioner's decision denying benefits is reversed and remanded.

**I.**     ***Background***

On June 23, 2004, Tarpley filed application for disability insurance SSI benefits with the Social Security Administration ("SSA"), alleging disability beginning on March 1, 2004. (R. 17).

Tarpley claims she suffers from bipolar disorder,[1] discogenic[2] and degenerative[3] disorders of the spine, crack cocaine dependance,[4] suicidal ideation,[5] hallucinations,[6] pain in all joints, neck pain, back pain, and knee pain.  (R. 19, 60, 63, 77, 852).  After being denied benefits initially and on reconsideration, on February 25, 2005, Tarpley requested an administrative hearing before an ALJ to review the decision.  (R. 30-38, 39, 41-45, 46, 852-865, 866-67).

A hearing was held on July 13, 2006, in Houston, Texas, at which time the ALJ heard testimony from Tarpley, George Gomez, Director of the Turning Point mental health facility, and Thomas W. King, a Vocational Expert ("VE").  (R. 888-940).  In a decision dated August 21, 2006, the ALJ denied Tarpley's application for benefits.  (R. 17-24).  On August 24, 2006, Tarpley requested review of the ALJ's decision by the Appeals Council of the SSA's Office of Hearings and Appeals.  (R. 12-13).  The Appeals Council, on May 18, 2007, denied Tarpley's request to review the

---

[1]  "Bipolar Disorder" pertains to a mood disorder characterized by a history of manic, mixed, or hypomanic episodes, usually with concurrent or previous history of one or more major depressive episodes, including bipolar I, bipolar II, and cyclothymic disorder. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 528 (29 ed. 2000).

[2]  "Discogenic" is caused by the derangement of an intervertebral disk. *See* DORLAND'S, *supra,* at 450.

[3]  "Degenerative" refers to the deterioration; change from a higher to a lower form; especially change of tissue to a lower or less functionally active form. *See* DORLAND'S, *supra,* at 465.

[4]  "Crack Cocaine Dependence" refers to the compulsive use of crack cocaine despite significant problems resulting from such use. Although tolerance and withdrawal were previously defined as necessary and sufficient for dependence, they are currently only two of several possible criteria; others include taking the crack cocaine longer or in larger amounts than planned, repeatedly expressing a desire or attempting unsuccessfully to cut down or regulate use, and continuing use in the face of acknowledged substance-induced physical or mental problems. The term is sometimes used more narrowly to refer only to physiological dependence, and in this sense it may be considered to be a phenomenon distinct from tolerance. *See* DORLAND'S, *supra,* at 476.

[5]  "Ideation" refers to the formation of a mental concept, image, or thought. *See* DORLAND'S, *supra,* at 874.

[6]  "Hallucination" refers to a sense perception without a source in the external world; a perception of an external stimulus object in the absence of such an object. *See* DORLAND'S, *supra,* at 783.

2

ALJ's determination.   (R. 6-9).   This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Tarpley filed this case on July, 11 2007, seeking judicial review of the Commissioner's denial of her claim of benefits.  *See* Docket Entry No. 1.

**II.**   *Analysis*

    **A.**   *Statutory Bases for Benefits*

      SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001).  The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of *indigence* and *disability*.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an  application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, June 2004, fixes the earliest date from which benefits can be paid.  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Tarpley has acquired sufficient quarters of coverage to remain insured for benefits through December 31, 2009. (R. 17).  Consequently, to be eligible for disability benefits, Tarpley must prove that she was disabled prior to that date.

Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Act. *See* 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a).  Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove 'disability' within the meaning of the Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

4

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A). Moreover, "the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

B.    *Standard of Review*

1.    *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.    *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. See *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, re-weigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve. *Id*.

C.     *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.     An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.     If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.     If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is

disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id*.

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if the impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. §

423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the

claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she

applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C.

§ 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.    The claimant meets the insured status requirements of the Social Security Act
      through December 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since March 1,
      2004, the alleged onset date (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.,*
      416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: bi-polar disorder,
      discogenic and degenerative disorders of the spine, and substance abuse (20
      C.F.R. §§ 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that
      meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,
      Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526,
      416.920(d),416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the
      claimant has the residual functional capacity to lift and/or carry 20 pounds
      occasionally and 10 pounds frequently. She can stand and/or walk 4 hours of
      an 8-hour day with a sit/stand option. She has unlimited push/pull ability, no
      limits in gross or fine dexterity but cannot climb stairs, ladders, ropes, or
      scaffolds. She gets along with others, and when not using illegal drugs, she
      can understand detailed instructions, concentrate on and perform detailed
      tasks, get along with others and respond and adapt to workplace changes and
      supervision.

6.    The claimant is able to perform past relevant work as a gas station attendant
      (20 C.F.R. §§ 404.1565 and 416.965).

(R. 19-22).  Even though the ALJ determined Tarpley could perform past relevant work, in the

alternative, the ALJ proceeded to the fifth step of the sequential evaluation process, and concluded:

7.    The claimant was . . . 52 years old on the alleged disability onset date, which is defined as an individual closely approaching advanced age (20 C.F.R. §§ 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9.    The claimant has acquired work skills from past relevant work (20 C.F.R. §§ 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 C.F.R. §§ 404.1560(c), 404.1566, 404.1568(d), 416.960(c), 416.966, and 416.968(d)).

11.   The claimant has not been under a "disability," as defined in the Social Security Act, from March 1, 2004 through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(R. 23-24).

This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Tarpley's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir.

1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*,

209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

### D.   *Issues Presented*

Tarpley claims that the ALJ's decision is not supported by substantial evidence.  *See* Docket

Entry No. 16.  Specifically, Tarpley claims that:  (1) the ALJ erred in finding that she did not meet

or equal Listing 12.04(C); (2) the ALJ failed to properly evaluate her substance abuse; (3) the ALJ

failed to properly evaluate her factitious disorder;[7] (4) the ALJ failed to properly evaluate her

credibility; and (5) the ALJ failed to properly evaluate her residual functional capacity.  *See id*.  The

Commissioner disagrees with Tarpley's contentions, maintaining that the ALJ's decision is supported

by substantial evidence.  *See* Docket Entry No. 17.

### E.   *Review of the ALJ's Decision*

#### 1.   *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of

the claimant's impairment is compared to a list of impairments presumed severe enough to preclude

any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually

working and her impairments match or are equivalent to one of the listed impairments, she is

presumed to be disabled and qualifies for benefits without further inquiry.  *See id*. at 532; *see also* 20

C.F.R. § 416.920(d).  When a claimant has multiple impairments, the Act requires the Commissioner

to "consider the combined effect of all of the individual's impairments without regard to whether any

---

[7]  "Factitious Disorder" is a mental disorder characterized by repeated, intentional stimulation of physical or psychological signs and symptoms of illness for no apparent purpose other than obtaining treatment. It differs from malingering in that there is no recognizable motive for feigning illness. *See* DORLAND'S, *supra,* at 529.

such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B);

*Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393. The medical findings of the

combined impairments are compared to the listed impairment most similar to the claimant's most

severe impairment. *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of

impairments matches or is equivalent to a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d at

619. The listings describe a variety of physical and mental illnesses and abnormalities, and are

typically categorized by the body system they affect. *See Zebley*, 493 U.S. at 529-30. Individual

impairments are defined in terms of several specific medical signs, symptoms, or laboratory test

results. *See id.* at 530. For a claimant to demonstrate that her disorder matches an Appendix 1 listing,

it must meet *all* of the specified medical criteria. *See id.* An impairment, no matter how severe, does

not qualify if that impairment manifests only some of the specified criteria. *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination

of impairments, is equivalent to a listed impairment, she must present medical findings equal in

severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531 (citing 20 C.F.R.

§ 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are

at least equal in severity and duration to the listed findings.   *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the extensive administrative record (*i.e.*, almost 1,000 pages) submitted in this case reveals that Tarpley went to hospitals and detoxification centers on numerous occasions for various physical and psychological ailments.  (R. 98-782).  Tarpley reportedly has been physically and sexually abused by her mother and her ex-husband.  (R. 398).  The record also reveals that Tarpley has a history of asthma, diabetes, cancer, high blood pressure, and arthritis in her family. She was diagnosed with bipolar disorder in 1998, and has had five hospitalizations due to cocaine dependence.  (R. 19).  She was incarcerated for drug possession but was released from jail at the end of March 2000.  (R. 392).  Tarpley was employed as a registered nurse for Memorial Northwest

Hospital for 20 years before her license was suspended.  (R. 394).  She also was employed by Right

Step as a substance abuse technician in 2003.  (R. 719).

On October 6, 1986, Tarpley visited Memorial Northwest Hospital complaining of pelvic

pressure and a uterine prolapse.[8]  She also complained of very irregular and heavy menstrual periods

with intermenstrual bleeding, severe dysmenorrhea,[9] and intermenstrual pain.  (R. 326).  Joseph

Montgomery, M.D. ("Dr. Montgomery") examined Tarpley and performed a vaginal hysterectomy[10]

and an anterior colporrhaphy.[11]  (R. 335).

On March 26, 1991, K. Shivshanker, M.D. ("Dr. Shivshanker") of Memorial Hospital

Northwest, treated Tarpley for a Schatzki's ring[12] at the gastroesophageal junction,[13] an hiatial

hernia,[14] and reflux esophagitis.[15]  She was prescribed antacids and H2 blockers to help with the

---

[8]  "Prolapse of Uterus" refers to the downward displacement of the uterus so that the cervix is within the vaginal orifice, the cervix is outside the orifice, or the entire uterus is outside the orifice.  See DORLAND'S, supra, at 1466.

[9]  "Dysmenorrhea" refers to painful menstruation.  See DORLAND'S, supra, at 555.

[10]  "Vaginal Hysterectomy" refers to the excision of the uterus through the vagina.  See DORLAND'S, supra, at 870.

[11]  "Colporrhaphy" refers to the operation of denuding and suturing the vaginal wall for the purpose of restructuring the vagina.  See DORLAND'S, supra, at 380.

[12]  "Schatzki's Ring" refers to an annular constriction of the lower esophagus, usually at the junction of the esophageal and gastric mucosa.  See DORLAND'S, supra, at 1580.

[13]  "Gastroesophageal Junction" refers to the junction pertaining to the stomach and esophagus.  See DORLAND'S, supra, at 732.

[14]  "Hiatial Hernia" refers to the herniation of an abdominal organ, usually the stomach, through the esophageal hiatus of the diaphragm.  See DORLAND'S, supra, at 813.

[15]  "Reflux Esophagitis" refers to a serious and sometimes life-threatening type of gastroesophageal reflux disease that involves damage to the esophageal mucosa, often with erosion, ulceration, and infiltration by neutrophils or eosinophils.  See DORLAND'S, supra, at 621.

therapy.  (R. 272).  Tarpley also has had four laser surgeries on a facial hemangioma[16] that covers the left side of her face and neck.  (R. 296, 298, 303, 313).

On February 22, 1993, Tarpley complained of abdominal pain and was admitted to Memorial Hospital Northwest and was seen by Jose B. Tang, Jr., M.D. ("Dr. Tang").  (R. 207).  Tarpley was treated for acute cholecystitis.[17]  (R. 208).  Subsequent studies revealed that Tarpley was suffering from gallstones.[18]  (R. 150).  Tarpley underwent a successful laproscopic cholecystectomy[19] on April 5, 1993, to remove the stones.  (R. 151).

On January 6, 1996, Tarpley sustained a blunt trauma to her left knee in a motor vehicle accident and complained of left knee pain, swelling, and the inability to bend or bear weight on the knee.  She was treated at Memorial Hospital Northwest by J. Barton Kendrick, M.D. ("Dr. Kendrick").  Dr. Kendrick examined Tarpley and assessed that her injury was most likely a contusion[20] with a possible traumatic chondromalacia patellae.[21]  He suggested conservative

---

[16]  "Hemangioma" refers to an extremely common benign tumor, occurring most commonly in infancy and childhood, made up of newly formed blood vessels, and resulting from malformation of angioblastic tissue of fetal life.  *See* DORLAND'S, *supra,* at 795.

[17]  "Acute Cholecystitis" refers to a form usually due to obstruction of the gallbladder outlet, with signs of ranging from mild edema and congestion to severe infection with gangrene and perforation.  *See* DORLAND'S, *supra,* at 340.

[18]  "Gallstone" refers to a concretion formed in the gallbladder or bile duct; the usual composition is cholesterol, a blood pigment liberated by hemolysis, or a calcium salt.  *See* DORLAND'S, *supra,* at 724.

[19]  "Cholecystectomy" refers to the surgical removal of the gall bladder.  *See* DORLAND'S, *supra,* at 340.

[20]  "Contusion" refers to an injury of a part without a break in the skin and with a subcutaneous hemorrhage.  *See* DORLAND'S, *supra,* at 399.

[21]  "Chondromalacia Patellae" refers to pain and crepitus over the anterior aspect of the knee, particularly in flexion, with softening of the cartilage on the articular surface of the patellae and, in later stages, effusion.  *See* DORLAND'S, *supra,* at 344.

15

management and placed a soft wrap on the left knee. Samples of anti-inflammatory medication and auxiliary crutches also were issued to Tarpley. Tarpley was discharged after her treatment. (R. 124).

On July 10, 12, and 16, 1996, Tarpley went to Memorial Hospital Southwest because she felt her mental function deteriorating despite medication and years of outpatient psychotherapy. She claimed feelings of worthlessness and having suicidal ideation with a plan to kill herself. She mentioned that her daughter was hospitalized for depression and that her daughter had been taking part in psychotherapy for the last five years. Tarpley stated that she was sexually abused as a child by her mother and her uncle. She also believed her mother to be psychotic. Emilio Cardona, M.D. ("Dr. Cardona") assessed that Tarpley's emotional difficulties appeared to have originated from her chaotic and abusive family system. (R. 796). Dr. Cardona administered Tarpley an Intelligence Quotient ("IQ") test. On the exam, she had a verbal score of 111, a performance IQ score of 108 and a full scale IQ score of 110. These scores placed Tarpley at the bottom of the high-average range of intelligence scores. Her lowest scores were received on the sub-tests most susceptible to interference by anxiety[22] and depression.[23] Her responses also were erratic, suggesting a lack of dedication to her school work. (R. 797). Dr. Cardona opined that Tarpley was a woman of high-average intelligence whose lack of dedication to school work and emotional preoccupation hurt her intellectual

---

[22] "Anxiety" refers to the unpleasant emotional state consisting of psychophysiological responses to anticipation of unreal or imagined danger, ostensibly resulting from unrecognized intrapsychic conflict. Physiological concomitants include increased heart rate, altered respiration rate, sweating, trembling, weakness, and fatigue. Psychological concomitants include feelings of impending danger, powerlessness, apprehension, and tension. *See* DORLAND'S, *supra*, at 109.

[23] "Depression" refers to a mental state of depressed mood characterized by feelings of sadness, despair, and discouragement. Depression ranges from normal feelings of "the blues" through dysthymic disorder to major depressive disorder. It in many ways resembles the grief and mourning that follows bereavement; there are often feelings of low self esteem, guilt, and self-reproach, withdrawal from interpersonal contact, and somatic symptoms such as eating and sleep disturbances. *See* DORLAND'S, *supra,* at 477.

functioning.  According to Dr. Cardona, emotionally, Tarpley experienced chronic depression for which she used hypomanic defenses.  She demonstrated a borderline level of organization, with narcissistic and paranoid personality features.  It was reported that she behaved her best during marriage, but, now, with the increased stress of living on her own and the issues present with her crack-abusing boyfriend, she seemed to be overwhelmed.  It was noted that, although she had the potential for an acute psychotic episode on the occurrence of severe stress, test results did not provide evidence of an on-going or incipient psychotic process.  (R. 798).

According to Dr. Cardona, Tarpley's difficulties seem to have originated from her chaotic and abusive family system.  (R. 797).  Dr. Cardona noted that Tarpley's creativity, above average intelligence, abstract verbal ability, motivation to get help, some capacity for relationships, some internal resources, and ability to see the world in conventional ways would be assets to her treatment. Dr. Cardona's impression was that with the combination of medication and a supportive hospital environment, Tarpley's depression would lift and she could resume her daily functioning without incident.  Dr. Cardona noted, however, that due to underlying personality changes, along with psychological interpretation and change, this would be difficult for Tarpley to achieve.  He believed that Tarpley needed a great deal of support and structure to help her resist the inclination to depend on intimate relationships as the solution to her problems. Dr. Cardona further opined that, if Tarpley could successfully control her self-defeating behavior, she could begin to process her past abuse and trust her therapists to help her.  (R. 799).  According to Dr. Cardona, by controlling this behavior, Tarpley could begin to separate from her family history psychologically, while identifying and accepting her own feelings and opinions.  As she learned more adaptive ways to express her feelings

and opinions, Dr. Cardona believed she could release her depression, improve her self concept, and reduce the need to act out behaviorally.  (R. 800).

Upon her admission to therapy on July 5, 1996, Dr. Cardona rated Tarpley's Global Assessment of Functioning ("GAF")[24] score at 30; upon discharge, on July 16, 1996, Tarpley's GAF score improved to 60.[25]  (R. 811).

On July 31, 1996, Tarpley went to Memorial Hospital Southwest again as a part of a six day a week day treatment program.  Dr. Cardona placed Tarpley in the program because he thought that Tarpley needed to be in a structured environment for a long period of time.  During this time, Tarpley was arrested, with her boyfriend, for being in possession of cocaine.  Tarpley expressed "devastation and depression" about having to be incarcerated.  The medical report noted that Tarpley was very depressed, suicidal, confused, extremely remorseful, and ashamed of her behavior.  Tarpley had been in psychotherapy[26] for 10 years, at that time, and for the last 6 years (post divorce), Tarpley's life was reportedly grossly chaotic.  It was noted that Tarpley became involved in relationships with men that

---

[24]  A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000). The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning. The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. A GAF rating of 30 indicates some impairment in reality testing or communication or major impairment is several areas, such as work or school, family relations, judgment, thinking, or mood. *See id*. at 34.

[25]  A GAF rating of 60 indicates " moderate" symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *See* DSM-IV-TR, *supra*, at 34.

[26]  "Psychotherapy" refers to the treatment of mental disorders and behavioral disturbances using verbal and nonverbal communication, including such psychological techniques as support, suggestion, persuasion, reeducation, reassurance, and insight, in order to alter maladaptive patterns of coping, relieve emotional disturbance, and encourage personality growth. It is usually contrasted with therapies involving physical interventions, such as drug or convulsive therapies. *See* DORLAND'S, *supra,* at 1489.

were "grossly dysfunctional." During her treatment, Tarpley's children visited her often and she was doing very well in her career as a registered nurse. Her initial treatment for her depression began with Prozac and Lithium. Dr. Cardona recommended that Tarpley stay at a halfway house and continue her treatment. Tarpley agreed to this because she realized that she needed to take her condition very seriously and that she needed some degree of structure. On August 12, 1996, upon discharge, Dr. Cardona assigned Tarpley a GAF score of 55.[27] (R. 788-789).

On June 23, 1998, Tarpley was admitted to the University of Texas Harris County Psychiatric Center ("HCPC") with complaints of depressed mood, suicidal ideation, a recent suicide attempt, low energy, crying spells, irregular appetite, and crack cocaine dependance. It was reported that Tarpley entered extremely dysphoric[28] and irritable. (R. 433). She was assigned a GAF score of 30, but improved once her medication was adjusted for efficiency. (R. 434). Improvement in sleep and appetite were noted while her mood became much more pleasant and stable. She denied any suicidal ideation as she expressed hope for the future while showing insight to her problems and motivation for treatment. (R. 436). Tarpley was discharged on July 29, 1998, with antidepressant medications,

---

[27] A GAF rating of 55 indicates " moderate" symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *See* DSM-IV-TR, *supra*, at 34.

[28] "Dysphoria" refers to feelings of restlessness, malaise, and feeling disquiet. *See* DORLAND'S, *supra,* at 556.

including Prozac,[29] Lithobid,[30] and Trazodone.[31]  By the time of her discharge, Tarpley's GAF score

had improved to 45.[32]  (R. 434).

On September 18, 1998, Tarpley again was admitted to the HCPC with complaints of

decreased mood, suicidal ideation, feelings of hopelessness, and crack cocaine dependance.  On

admission, Tarpley was put on suicide watch for five days because of her depression.  This was later

removed after she began a medication regimen and began to show progress.  Tarpley was discharged

10 days later on the September 28.  She denied suicidal or homicidal ideation.  Her mood had

improved as she was calm and no longer showing signs of depression.  (R. 428).  Her thought process

became much more logical and goal directed.  She was assigned a GAF score of 50[33] on discharge.

She was prescribed Prozac, Trazodone, Lithobid, and a Ventolin[34] inhaler for her asthma on

discharge.  (R. 429).

---

[29]  "Prozac" is a selective serotonin uptake inhibitor used in the treatment of depression, obsessive-compulsive disorder, and bulimia nervosa; administered orally.  *See* DORLAND'S, *supra,* at 689.

[30]  "Lithobid" is a tablet used to treat patients with acute mania.  *See* PHYSICIANS' DESK REFERENCE 1692, 1694 (61st ed. 2007).

[31]  "Trazodone" is an antidepressant used to treat major depressive episodes with or without prominent anxiety; also used to treat diabetic neuropathy and other types of chronic pain.  *See* DORLAND'S, *supra,* at 1868.

[32]  A GAF rating of 45 indicates " serious" symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  *See* DSM-IV-TR, *supra*, at 34.

[33]  A GAF rating of 50 indicates " serious" symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  *See* DSM-IV-TR, *supra*, at 34.

[34]  "Ventolin" is a brand name for Albuterol, which is used as a bronchodilator for the treatment and prophylaxis of reversible bronchospasm in obstructive airway disease; administered orally and by inhalation. *See* DORLAND'S, *supra,* at 45.

Tarpley enrolled herself into the Permian Basin Community Center detox unit on April 3, 2000, and was discharged on May 11, 2000.  Tarpley was diagnosed with bipolar disorder, borderline depression, and crack cocaine dependence.  At that time, Tarpley was taking the medications Axid,[35] Lithobid, Trazadone, and Amoxapine.[36]  (R. 400).  She was prescribed Prozac for her depression and enrolled into Permian Basin's Level II detoxification program for her cocaine dependance.  (R. 402-403).  Her intake report detailed previous hospitalizations throughout 1996 and 1998.  The staff at the detoxification center also noted that Tarpley had a dislocated left knee.  Tarpley told the staff that she was depressed and had a history of depression in her family.  She claimed that she had experienced suicidal ideation.  (R. 400).

In May 2000, Tarpley was discharged from the Permian Basin Community Center detoxification unit and moved into the Walker House–*i.e.*, a halfway house with individual therapy, group therapy, and substance abuse counseling.  During her time at the Walker House, Tarpley's symptoms of depression progressively improved as she continued to take her medication.  (R. 403).

Tarpley visited or had visits from the Mental Health Mental Retardation Authority of Harris County ("MHMRA") on a regular basis.  On July 20, 2001, MHMRA put together a plan of care that listed Tarpley's symptoms as depressed mood, low energy, low motivation, excessive sleeping, social isolation, over-eating, feelings of worthlessness, helplessness, hopelessness, history of suicidal ideation with a plan, and a loss of interest in activities.  Her manic symptoms were listed as racing

---

[35]  "Axid" is an antagonist to histamine H2 receptors used to inhibit gastric acid secretion in the treatment of gastric and duodenal ulcer, gastroesophageal reflux, and conditions that cause gastric hypersecretion; administered orally.  *See* DORLAND'S, *supra,* at 1221.

[36]  "Amoxapine" refers to a tricyclic antidepressant of the dibenzoxazepine class used for the treatment of symptoms of depression in neurotic and psychotic depressive disorders and endogenous and reactive depression; administered orally.  *See* DORLAND'S, *supra,* at 65.

21

thoughts, decreased need for sleep, hyper-sexuality, pressured speech, increased energy, irritability, hyperactivity, mood swings, spending sprees, history of paranoia, and a history of auditory hallucinations.  Tarpley was given objectives, such as, taking medication as prescribed, attending scheduled clinic appointments, reporting any side effects to the medication or increase in psychiatric symptoms to the treatment team, and following up on all community referrals.  (R. 774).  MHMRA also addressed Tarpley's history of crack cocaine abuse.  Tarpley was given objectives, such as, complying with random drug tests, refraining from alcohol or illicit drug use, attending a twelve step recovery program at least once a week, and agreeing to proceed to intensive chemical dependency treatment if her drug tests were consistently positive.  (R. 775).

On October 12, 2001, Tarpley reported to the MHMRA staff that she was feeling "very tense and  stressed out."  She reported an increase in anxiety and also showed concerns about her weight gain.  She alleged that she was trying to have her registered nurse license reinstated and that was causing her more anxiety.  (R. 767).

Tarpley continued to require on-going psychiatric treatment.  (R. 767).  On December 21, 2001, and April 12, 2002, the MHMRA staff noted Tarpley's strengths as her history of treatment compliance, her motivation for treatment, the fact that she had transportation available, her ability to participate in treatment, a stable environment, her technical and vocational skills, and her good intellectual skills.  Her weaknesses were reported as her physical problems, limited independent living skills, substance abuse, impaired decision making ability, family difficulties, lack of insight into her problems, social withdrawal, and a difficulty with interpersonal relationships.  (R. 752, 758).

In June 2002, an examination of Tarpley's right knee showed a popliteal[37] mass of 3 centimeters with no misalignment or swelling.  Her knee had a full range of motion with lateral crepitance and there was full stability in the knee.  By April 2003, the popliteal mass was gone.

In December 2003, Tarpley visited the Kelsey-Seybold Clinic complaining of knee pain.  An x-ray revealed curvilinear calcification[38] adjacent to the medical epicondyle[39] of the left femur, most probably due to trauma, with mild degenerative change in the knee.  (R. 418).  At that time, her medication was listed as Albuterol, Advair,[40] Wellbutrin,[41] Paxil,[42] and Prevacid.[43]  (R. 420).

On August 26, 2002, MHMRA staff noted in the record that Tarpley had not been attending her scheduled clinic appointments at the MHMRA.  Her main strength at that point was reported to be her ability to participate in and acceptance of her treatment.  Her potential barriers for treatment were noted as limited vocational skills, impaired decision making ability, financial difficulties, and that she had little insight into her problems.  (R. 746).  On the same day, Tarpley was given another

---

[37]  "Popliteal" refers to the posterior surface of the knee.  *See* DORLAND'S, *supra,* at 1437.

[38]  "Calcification" refers to the process by which organic tissue becomes hardened by a deposit of calcium salts within its substance.  *See* DORLAND'S, *supra,* at 263.

[39]  "Epicondyle" refers to an eminence upon a bone, above its condyle.  *See* DORLAND'S, *supra,* at 605.

[40]  "Advair" is an oral inhaler used to treat asthma and chronic bronchitis.  *See* PHYSICIAN'S DESK REFERENCE, *supra,* at 1311.

[41]  "Wellbutrin" is a monocyclic compound structurally similar to amphetamine, used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal; administered orally.  *See* DORLAND'S, *supra,* at 253.

[42]  "Paxil" is a selective serotonin reuptake inhibitor used in the treatment of depression, obsessive-compulsive disorder, and panic disorder; administered orally.  *See* DORLAND'S, *supra,* at 1325.

[43]  "Prevacid" is a substituted benzimidazole that inhibits the secretion of gastric acid, used for the symptomatic treatment of duodenal ulcer and esophagitis, and for the long term treatment of hyperchlorhydria; administered orally.  *See* DORLAND'S, *supra,* at 962.

Five Axis DSM Diagnosis.  On axis one, it was reported that Tarpley suffered from cocaine abuse and bipolar disorder with moderate depression in full remission.  Tarpley had no diagnosis for axis two on this exam.  Tarpley suffered from gastritis[44] and asthma which made up axis three.  Axis four consisted of problems with her primary support group, occupational problems, economic problems, and problems with access to healthcare.  On axis 5, Tarpley received a GAF score of 50. (R. 749).

On November 4, 2002, Tarpley reported that her depressive symptoms had improved with medication. Her medications, however, had to be adjusted due to an increase in anxiety.  At that time, Tarpley was living at the Walker House, which she reportedly enjoyed.  Also, in November 2002, Tarpley told an MHMRA staff member that the home was a good fit for her and that she had been sober for 4 years.  (R. 736).  This statement was later found to be inaccurate, as Tarpley failed a drug test.  Although Tarpley lost her nursing license because of drug use, she was able to get it reinstated in May 2003.  (R. 908).  She worked briefly after her license was reinstated, but she testified at the administrative hearing that she lost her license again within 6 months due to what she called a "psychotic break."  (R. 894).

On February 21, 2003, a quality mental health professional ("QMHP") at the MHMRA noted that Tarpley needed to stay on her medication to manage and control her symptoms.  She also needed to have her sobriety monitored.  The QMHP mentioned that Tarpley's daughters were supportive and would come and visit.  (R. 729).  On February 21 and May 15, 2003, Tarpley was prescribed medication maintenance assessments by V. Janarthanan, M.D. ("Dr. Janarthanan").  In February, Dr. Janarthanan did not report Tarpley had any symptoms, but he did report that she had an overall functioning score of six out of 10.  In May, he reported that she was suffering slightly from depression

---

[44]  "Gastritis" refers to inflammation of the stomach.  *See* DORLAND'S, *supra,* at 730.

and anxiety.  He gave her an overall functioning score of six out of ten and a symptom severity of two out of ten.  Tarpley was ordered to continue taking her medication and continue with her treatment after both assessments.  (R. 723, 724, 733, 734).

In January and February 2004, Tarpley went to Kelsey-Seybold Clinic for various issues including a cough and pain in her neck, back, and left arm.  The record lists her medications as Wellbutrin, Lithium,[45] Zyprexa,[46] Pepcid,[47] and Albuterol.  (R. 412, 417).  There is no record of further hospitalization until June 2004, though Tarpley alleged a March hospital stay.

In June 2004, Tarpley admitted herself for a ten day stay at an MHMRA facility, alleging suicidal ideation and hallucinations.  She tested positive for cocaine even though she had denied using the drug.  Progress notes indicated that she had been noncompliant with treatment for five months.  By July 2004, outpatient notes indicated a full response to medication and that Tarpley was "doing a lot better."  There were no reports of hallucinations or suicidal ideation.  There were no medical complaints during this time by Tarpley.  By October 2004, Tarpley's symptoms were reported as mild, with moderate depression being the only significant impairment.  Tarpley reported anxiety about being denied benefits by Social Security, but her sleep and appetite were found to be adequate and she exhibited no manic symptoms.  (R. 419, 425).

---

[45] "Lithium," in a carbonate form, is a salt used in the treatment of acute manic states and in the prophylaxis of recurrent affective disorders manifested by depression or mania only, or those in which both mania and depression occur occasionally; administered orally.  See DORLAND'S, *supra,* at 1019.

[46] "Zyprexa" is a pill used for the treatment of schizophrenia and bipolar disorder.  See PHYSICIANS' DESK REFERENCE, *supra*, at 1830, 1831.

[47] "Pepcid" is a histamine H2 antagonist used in the treatment of duodenal ulcers.  See DORLAND'S, *supra,* at 651.

On June 9, 2004, Tarpley was admitted again to the HCPC due to an increase in depression, suicidal ideation with a plan, and auditory hallucinations.  She denied any substance abuse.  Upon admission, Tarpley's GAF score was rated at 18.[48]  After admission, Tarpley was compliant with the medications that were prescribed to her and an effective response by her was achieved by the time of discharge.  Tarpley demonstrated adequate improvement of presenting symptoms and according to the HCPC, reached the maximum benefit of impatient hospitalization.  At the time of discharge, Tarpley's GAF was marked at 47.  She was discharged on July 18, 2004, with the discharge medications of Risperidone,[49] Lexapro,[50] Lithium, and a Ventolin Puffer.  (R. 426-427).

On June 8 and 24, 2004, the MHMRA administered Tarpley two more Five Axis Diagnosis Assessments.  On the first exam, which took place on June 8, Tarpley received the following results.  On axis one, Tarpley suffered from cocaine abuse and bipolar disorder with moderate to severe depression including psychotic features.  Tarpley had no diagnosis for axis two on this exam.  Tarpley suffered from gastritis and asthma which made up axis three.  Axis four consisted of problems with

---

[48]  A GAF rating of 18 indicates "some danger of hurting self or others" (*e.g.*, suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (*e.g.*, smears feces) or gross impairment in communication (*e.g.*, largely incoherent or mute).  *See* DSM-IV-TR, *supra*, at 34.

[49]  "Risperidone" is a benzisoxazole derivative used as an antipsychotic agent, administered orally. Its mechanism of action is unknown, but its activity may result from a combination of dopamine and serotonin antagonism.  *See* DORLAND'S, *supra*, at 1581.

[50]  "Lexapro" is a pill indicated for the treatment of major depressive disorder. *See* PHYSICIANS' DESK REFERENCE, *supra*, at 1190.

her primary support group, occupational problems, economic problems, problems with access to healthcare, and housing problems. On axis five, Tarpley received a GAF score of 20.[51] (R. 714).

On June 24, Tarpley was given the second Five Axis Diagnosis Assessment. On axis one, Tarpley suffered from cocaine abuse, bipolar disorder, and moderate to severe depression with psychotic features. On axis two, Tarpley suffered from personality disorder. On axis three, it was noted that Tarpley had gastritis and asthma. On axis four, it was found that Tarpley suffered from occupational problems, economic problems, problems with access to healthcare, housing problems, and problems related to the social environment. Finally, on axis five, Tarpley received a GAF score of 47. (R. 695). The recommended treatment for Tarpley was medication management and case coordination. (R. 699). On June 21, Tarpley agreed to be discharged from MHMRA and reside, while continuing her treatment, at the Turning Point Personal Care Home. (R. 706). On July 26, it was reported that Tarpley seemed agitated, was talking to herself, and was pacing around. (R. 674).

On August 12, 2004, Tarpley presented for a consultative evaluation with SSA physician Theodore Pearlman, M.D. ("Dr. Pearlman"). At that time, Tarpley complained of having a psychotic breakdown and being severely depressed and suicidal. She alleged that she came close to suicide but was stopped by a friend. (R. 444). Tarpley complained of hearing voices that told her to kill herself and that her kids show no interest in seeing her. Dr. Pearlman noted that Tarpley alleged difficulty with memory, recalling only the current president and not previous presidents. Dr. Pearlman reported that Tarpley recalled only one out of three words after an interval of fifteen minutes. When asked to repeat a six digit anagram, Dr. Pearlman noted that she only repeated the first two digits. Further, Dr.

---

[51] A GAF rating of 20 indicates "some danger of hurting self or others" (*e.g.*, suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (*e.g.*, smears feces) or gross impairment in communication (*e.g.*, largely incoherent or mute). *See* DSM-IV-TR, *supra*, at 34.

Pearlman reported that she provided evasive answers to test questions on comprehension from the Wechsler Adult Intelligence Scale.  On the One-Hundred Minus Three Serial Subtraction Test, her response of "ninety-seven" was correct but then the next response was "ninety-three" and then she stopped.  (R. 445).

Dr. Pearlman opined that the mood swings Tarpley was experiencing were capricious, superficial, and not distinctive in keeping with bipolar disorder.  He believed that they were more the features of factitious disorder, with psychological symptoms.  Dr. Pearlman found it difficult to differentiate between valid impaired concentration and factitious responses.  He reported that her answers to the math questions, for someone who has a high school and college education, collectively supported an impression of factitious disorder.  According to Dr. Pearlman, Tarpley's personality came across as passive and self-defeating, but Dr. Pearlman noted that Tarpley was able to prepare meals, and handle her finances, albeit potentially irresponsibly, due to her degree of personality functioning.  Dr. Pearlman assigned Tarpley a GAF rating of 60.[52]  (R. 446).

During a Residual Functional Capacity Assessment for Mental Disability that was conducted by a medical consultant on August 26, 2004, Tarpley was found to not be significantly limited when it came to her mental activity.  It was reported that Tarpley was not significantly limited when it came to the following activities:  remembering locations; remembering work-like procedures; understanding and carrying out short, simple, and detailed instructions; maintaining attention and concentrate for extended periods; performing activities within a schedule; maintaining regular attendance, being punctual; working with others efficiently and without supervision; making simple

---

52  A GAF rating of 60 indicates " moderate" symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *See* DSM-IV-TR, *supra*, at 34.

work related decisions, asking questions, or requesting assistance; completing a normal workday and workweek without interruptions from psychologically based symptoms;  performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; maintaining awareness of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and, setting realistic goals or making plans independently of others.  (R. 449-450).  The only three activities that the consultant found Tarpley to be moderately limited:  accepting instructions; responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting.  (R. 450).  The consultant noted that Tarpley had a factitious disorder with predominantly psychological symptoms, including borderline personality disorder and self-defeating traits, along with crack cocaine dependance. (R. 460-461).

The consultant reported that Tarpley was living in a homeless shelter, attending a daily drug rehabilitation program, and visiting the MHMRA monthly for medication.  It was reported that Tarpley rode the bus, had a driver's license, and was able to leave home and get around as needed. The consultant further noted that Tarpley was able to do light housework, prepare meals, and handle her personal finances.  She was assigned a GAF of 60 at the conclusion of the assessment.  (R. 465).

On September 13, 2004, Tarpley reported to the MHMRA, complaining of painful depression and low energy.  (R. 667).  She was told by the MHMRA staff to continue medication management to reduce and stabilize her psychiatric symptoms.  (R. 668).

On October 25, Tarpley was assessed under the Adult Uniform Assessment for Resiliency and Disease Management by Inayath Nayeemuddin, M.D. ("Dr. Nayeemuddin").  In the first section of

the assessment, on a one to five scale, questions were asked about the recommended level of care the patient should receive.  Tarpley scored a one in the categories of risk of harm, co-occurring substance abuse, and criminal justice involvement.  She scored a two in the areas of needing support needs, psychiatric related hospitalization, and functional impairment.  She scored a four when it came to housing instability and a five when it came to employment problems.  She was assigned a calculated level of care recommendation of SP1.  She was also found to want or need employment.  On the Total Brief Bipolar Disorder Symptom Scale, which ranged from ten to seventy,  Tarpley scored a fifteen out of seventy.  (R. 652).  On a one to seven point system, Tarpley scored one point each when it came to hostility, elevated mood, grandiosity, unusual thought content, excitement, and hyperactivity.  She scored two points each in the areas of anxiety, emotional withdrawal, and blunted withdrawal.  Her only three point item was for depressed mood.  (R. 654).

In December 2004, Richard Zimmerman, M.D. ("Dr. Zimmerman") conducted a disability examination on Tarpley.  Tarpley complained of pain in all joints, arthritis, and chronic back pain as well as pain and stiffness in her hips, neck, and knee.  (R. 493).  Dr. Zimmerman ordered x-rays, which indicated advanced degenerative disc disease[53] at L4-L5,[54] with moderate disease at L5-S1,[55] early osteoarthritis[56] in the SI joints, and no abnormalities in the hips.  (R. 497).  Tarpley reported

[53] "Degenerative Disc Disease" refers to the steady deterioration of the circular or rounded flat plates found in the spine.  *See* DORLAND'S, *supra,* at 526.

[54] "Lumbar Vertebrae" refer to the five vertebrae between the thoracic vertebrae and sacrum that are referred to as symbols L1-L5.  *See* DORLAND'S, *supra,* at 1958.

[55] "Sacrum" refers to the triangular bone just below the lumbar vertebrae. The sacral area contains five sacral vertebrae referred to as symbols S1-S5.  *See* DORLAND'S, *supra,* at 1593.

[56] "Osteoarthritis" refers to a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bones at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity.  *See* DORLAND'S, *supra,* at 1286.

during the examination that she was able to do her own activities of daily living and simple housekeeping chores.  She asserted that she was able to get up and around with no problem and without assistance.  She claimed that her mother was both alcoholic and bipolar and believed that three of her daughters were bipolar. (R. 494).  Dr. Zimmerman found that Tarpley was suffering from arthralgia[57] with normal joint exam, obesity,[58] bipolar disorder, and substance abuse.  (R. 495).  At that time, Tarpley's height was reported as 67" and she weighed 224 pounds.  (R. 494).  He further noted that, based on the evidence of the examination, Tarpley had no persistent disorganization of motor function, and was able to sit, stand, handle objects, hear and speak normally, move around, lift and carry (limited due to back pain and obesity), squat, hop, reach, handle, finger, and feel.  (R. 495).

Based on a Mental Residual Functional Capacity examination conducted in December 2004, by Richard Alexander, M.D. ("Dr. Alexander"), Tarpley again was found not to be significantly limited for the same reasons as the previous assessment.  The only difference between the two assessments was that Tarpley was no longer found to be significantly limited when it came to the ability to respond well to changes in the work setting.  (R. 505A-506).  Dr. Alexander noted that Tarpley had the ability to understand, remember, and carry out detailed, but not complex, instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings.  (R. 507).  Dr. Alexander found that Tarpley had

---

[57]  "Arthralgia" refers to pain in the joints.  *See* DORLAND'S, *supra,* at 151.

[58]  "Obesity" refers to an increase in body weight beyond the limitation of skeletal and physical requirement, as the result of an excessive accumulation of fat in the body.  *See* DORLAND'S, *supra,* at 1251.

borderline personality disorder,[59] along with factitious disorder with predominantly psychological signs and symptoms.  He further determined that Tarpley suffered from crack cocaine dependance. (R. 516-517).

In December 2004, a Physical Residual Functional Capacity Assessment also was conducted on Tarpley.  Her primary diagnosis was degenerative disc disease and her secondary diagnosis was obesity. (R. 498). It was found that Tarpley could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk about six hours in an eight hour workday; sit for a total of about six hours in an eight hour workday; and, had unlimited ability to lift/carry.  Tarpley was found to have no postural, manipulative, visual, communicative, or environmental limitations.  The consultant found Tarpley's alleged limitations were not fully supported by the record evidence.  (R. 499).

In January and August 2005, Tarpley visited Dr. Nayeemuddin at MHMRA, who found her to be depressed with a constricted affect.  At that time, Tarpley was found to be casually dressed, with a cooperative attitude, normal motor activity, normal speech, and a goal oriented thought processes. (R. 646).  Tarpley received extensive rehabilitative services in the form of counseling, medication education, and education about her condition.  She was reported as cooperative and understanding. (R. 646).

In September 2005, Tarpley exhibited progress in the knowledge of her ailments and symptoms.  She volunteered at the Turning Point Shelter and performed various jobs such as a medication person, telephone receptionist and kitchen helper.  She was assisted by the Shelter Plus

---

[59] "Personality Disorder" refers to a category of mental disorders characterized by enduring, inflexible, and maladaptive personality traits that deviate markedly from cultural expectations, are self-perpetuating, pervade a broad range of situations, and either generate subjective distress or result in significant impairments in social, occupational, or other functioning.  *See* DORLAND'S, *supra*, at 531.

Care Program ("SPCP"), in obtaining an apartment in a complex that allowed people with felony charges to move in and reside. (R. 505).

In January 2005, Tarpley reported she was not doing well because she was constantly depressed, anxious, and worried about her financial situation. Dr. Nayeemusddin's recommendation was to maintain her current medication and treatment plan and to monitor her progress. (R. 647, 660). In February and March 2005, Tarpley continued to be treated once a month by a QMHP, and had no major issues or setbacks with her treatment. (R. 622, 630). On May 6, a QMHP reported that Tarpley was feeling sad and overwhelmed. She was told to continue taking her medication, keeping her appointments, and abstaining from illicit drug use. (R. 612). Tarpley reported no crying spells, agitation, or mood swings. She also reported that her sleep and appetite had remained stable. (R. 615).

On August 4 and 9, 2005, a QMHP visited Tarpley. The QMHP advised Tarpley about the importance of strict adherence to her medication. Tarpley asked questions regarding the side effects from taking the medications and seemed to understand the importance of continuing to take her medication as prescribed. (R. 593). Tarpley reportedly was motivated to improve her situation and excited about receiving rehabilitation services from the MHMRA. (R. 594). Her three main issues, according to the MHMRA, were substance abuse, structuring daily activities, and maintaining her self-esteem and self-concept. (R. 601-602). At that time, Tarpley was unemployed and did not assist at the shelter. Tarpley claimed, however, an on-going difficulty with concentration and memory that allegedly affected her ability to function at work.

On September 2 and 29, 2005, a QMHP met with Tarpley to discuss symptom management and effective coping techniques for those symptoms. Tarpley had a negative impression of alcoholics

anonymous ("AA") because she thought the members encouraged failure.  A QMHP advised Tarpley of the benefits of AA, such as social interaction, support, and the teaching of life skills, that could eventually help conquer her problems.  (R. 591).

On October 6, 13, and 25, 2005, Tarpley was visited by a QMHP to discuss drugs, mental illness, and the consequences of a mentally ill persons using drugs.  She reported that she felt better because some of her duties at the shelter had been removed. (R. 579).  Tarpley complained of disturbed sleep and nightmares, but appeared calm, cooperative, and showed no negative symptoms. (R. 584).

In November 3, 17, and 22, 2005, Tarpley was visited by a QMHP.  Tarpley continued to show progress by keeping her appointments and taking her medication as prescribed.  She received treatment for her depression due to her lack of a support system, poor independent functioning, and housing issues.  Tarpley reported some stress because her boyfriend was incarcerated on drug charges. (R. 569).  She alleged that she had been increasingly afraid of the dark and riding the bus.  It was reported that Tarpley displayed insight into her illness and understood the importance of her treatment.  (R. 567).  It was noted that Tarpley continued education on how drugs can affect people with mental illness.  (R. 568).

On December 14, 22, and 30, 2005, Tarpley was visited by a QMHP.  She complained of difficulty sleeping, hyperactivity, over-eating, and depression.  Thomas Blocher, M.D. ("Dr. Blocher") gave Tarpley her medication assessment for the aforementioned problems.  Dr. Blocher recommended that Tarpley continue her current medication and start the new medications to control the side effects that she allegedly was experiencing.  Tarpley expressed symptoms of fear and depression.  (R. 559-560).  It was noted that a QMHP advised Tarpley of some coping skills for

dealing with fear and anxiety. When it came to her depression, the QMHP told Tarpley that she could do things that she enjoyed and not to spend too much time alone. (R. 564).

On January 14, 22, 25, and 30, 2006, Tarpley was visited by a QMHP. Tarpley was on the waiting list for the SPCP, which assisted MHMRA consumers in finding an apartment. (R. 552). Tarpley attended all of her scheduled meetings and, reportedly, was doing better. She worked in the office of the Turning Point Shelter, and reportedly was visited by her daughter regularly. It was noted that Tarpley advised that she had a lawyer working on her Social Security claim. (R. 554).

On February 2, 6, 17, and 21, 2006, Tarpley was visited by a QMHP. Tarpley, reportedly, was making moderate progress toward her treatment goals of moving out of the Turning Point Shelter. She continued to maintain her sobriety and manage her symptoms. She remained unemployed, but continued to volunteer at the shelter. The QMHP reported that Tarpley continued to feel stressed and depressed about certain situations. Tarpley was advised that normal stress is always present and she had to learn to deal with everyday stresses. It was noted that Tarpley claimed that she had received some money from her children and could use it toward her new apartment. She allegedly worked on creating a monthly budget for rent and other bills as well as a list of needed household items. (R. 538, 542, 546).

On March 2, 4, 6, 17, 23, and 30, 2006, Tarpley was visited by a QMHP to assist her with independent living skills and symptom management. Tarpley advised that she would moving into her own home soon, but the QMHP noted some stress because Tarpley was worried about income. The QMHP reported that Tarpley was very depressed, but Tarpley had denied any suicidal ideation or any drug or alcohol use. Tarpley reportedly remained compliant by keeping her appointments and taking her medication as prescribed. It was reported that she was very responsive to intervention. (R. 529-

533).  In a March 2006 progress note, Tarpley's self-rated symptom severity was "0," and her doctor's rating was a "0" for mania and depression, with an overall rating of 6 out of 10.  Her last progress note reported rebuilding social skills through participation in activities.  (R. 533).

On April 6, 2006, a QMHP, visited Tarpley again at the homeless shelter to provide psychological rehabilitation services to help improve her socialization.  At that time, Tarpley denied suicidal ideation and drug or alcohol use.  She was reported to be very receptive to the intervention and responded politely.  (R. 526).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000). "Generally, the longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the SSA] will give to the source's medical opinion." 20 C.F.R. §§ 404.1527 (d)(2)(i); 416.927(d)(2)(i). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical,

36

laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211. It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, the ALJ erred by failing to sufficiently analyze whether Tarpley's alleged bipolar disorder met the requisite criteria for Listing 12.04.  Although the ALJ acknowledged that Tarpley suffered from some functional limitations, the ALJ determined that all of Tarpley's hospitalizations were drug-related and/or for detoxification.[60]  (R. 21-22).  The ALJ concluded that Tarpley had "no episodes of decompensation" and that there was "no evidence of symptoms" meeting the 12.04C criteria.  (R. 21).  Contrary to the ALJ's decision, the record is replete with progress notes documenting depressive syndrome.  Tarpley exhibited signs of appetite disturbance with change in weight, sleep disturbance, thoughts of suicide, hallucinations, difficulty concentrating, decreased energy, and feelings of guilt and worthlessness.  (R. 400, 428, 436, 695, 714, 767, 774, 788, 789, 796, 797, 799, 800).  Similarly, the record evidences manic syndrome.  Tarpley exhibited signs of hyperactivity and hallucinations.  (R. 417, 419, 426, 774, 775, 870).  In fact, Tarpley has a more than

---

[60] "Because the ALJ determined that Tarpley was not disabled, the ALJ was not required to conduct a drug abuse and alcoholism analysis ("DAA Analysis") to determine if Tarpley's substance abuse was a contributing factor to the disability determination. *See Brown v. Apfel*, 192 F.3d 492, 498-99 (5th Cir. 1999); 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 416.935.  Upon remand, however, if there is a finding of disability, such an evaluation may become necessary.  Although the record suggests that Tarpley's abuse of drugs may be in remission and/or a means by which Tarpley tried to alleviate her symptoms of bipolar disorder, it is not sufficient to imply that her bipolar disorder would disappear if Tarpley stopped abusing drugs.  If Tarpley's bipolar disorder is found to be disabling and, assuming, *arguendo*, that Tarpley is still abusing drugs, Tarpley will bear the burden of proving that drugs are not a contributing factor material to her disability.  *See Brown*, 492 F.3d at 498.

twenty year history of psychotherapy.  (R. 788).  Because the ALJ failed to sufficiently analyze all of the listing criteria under 12.04, this case must be remanded.

In addition, the ALJ improperly relied on Dr. Pearlman's psychological evaluation of Tarpley in 2004.  (R. 22).  Dr. Pearlman, an SSA physician, evaluated Tarpley and opined that her symptoms, collectively, supported an impression of factitious disorder.  (R. 445).  Dr. Pearlman's impression was that Tarpley's mood swings were superficial and not in keeping with bipolar disorder.  (R. 445).  Dr. Pearlman noted, however, that he found it "difficult" to differentiate between valid impaired responses and factitious responses.  (R. 446).  Contrary to Dr. Pearlman's opinion, the medical records in this case clearly document Tarpley's treatment for bipolar disorder.  Because of the vast difference between the record evidence and Dr. Pearlman's opinion, the ALJ should have sought the advice of a medical expert to review the records and testify regarding Tarpley's alleged mental limitations. Consequently, this case must be remanded for a proper evaluation of Tarpley's alleged mental limitations.

Because the ALJ failed to sufficiently analyze the extensive record evidence in this matter and improperly relied on Dr. Pearlman's opinion, this case must be remanded for a proper evaluation of Tarpley's alleged bipolar disorder, factitious disorder, and, if not in remission, her substance abuse disorder.  It would be beneficial to the ALJ to have a medical expert, who specializes in psychiatry, present at any new administrative hearing to properly review and evaluate the medical evidence.

### 2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding claimant's subjective complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Sharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a claimant alleges disability resulting from pain, she must

establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley v. Charter*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27 F.3d at 164 & n.18.

Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

39

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Tarpley testified regarding her complaints of pain.  (R. 897). During a 2004 disability examination, Tarpley complained of pain and stiffness in all of her joints including her hips, knee and neck, along with arthritis and chronic back pain.  Dr. Zimmerman found advanced degenerative disk disease at L4-L5, with moderate disease at L5-S1, early osteoarthritis in the SI joints, and no abnormalities in the hips.  (R. 497).  Notwithstanding, Dr. Zimmerman concluded that Tarpley should be able to complete her own activities of daily living along with simple housekeeping chores.  He also opined that she should be able to get up and around without requiring assistance.  (R. 493).

Finally, the Court does not doubt that Tarpley suffers from pain.  The records, however, do not support a finding that Tarpley's pain is constant and unrelenting and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F3d at 522; *see also Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  In fact, there a relatively few references in the record documenting Tarpley's complaints of pain.  Moreover, as noted by the ALJ, Tarpley's symptoms appear to be alleviated with medication.  *See Johnson*, 864 F.2d at 348 (conditions controlled by medication or therapy cannot serve as a basis for a finding of disability).  Accordingly, there is substantial evidence to support

40

the ALJ's finding that Tarpley's subjective reports of pain do not rise to the level of disability.

### 3. *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223,

1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545. When a claimant's residual functional capacity is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520. The testimony of a vocational expert is valuable in this regard, as "he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id*. In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id*. In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .  The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.  Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id*. To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In this case, the ALJ, relying on the record evidence and the testimony of the VE, King, determined that Tarpley retained the residual functional capacity to do physical work and mental activities on a sustained basis despite limitations from her impairments. (R. 23-24).  The ALJ, however, failed to formulate hypothetical questions for the VE that encompassed all of Tarpley's recognized limitations.  The ALJ posed the following questions to the VE:

> Q: - - assume an individual who's closely approaching advanced age with a twelfth grade plus two years of, of college education; occasional ability to lift 10 - - lift 20 pounds, 10 pounds frequently; with a sit stand option; can walk four of eight hours; push, pull, and gross and fine dexterity is unlimited; there's no climbing of stairs, ladders, ropes, or scaffolds; gets along with others; and when not using drugs or cocaine, illegal drugs, she can understand detailed instructions, concentrate and perform detailed tasks, and respond and adapt to workplace changes and

> supervision.  Now, based on that, can you make an assessment as to the ability to do past work?
>
> A: Yes sir,  under that hypothetical, she cannot perform the nursing jobs in the past work, but a person could work as a service station attendant under that hypothetical.

(R. 934-935).  King also testified that Tarpley could perform light, unskilled jobs such as a companion, sitter, medication aide, office helper, garment sorter, assembler.  (R. 935-937).  In the second hypothetical, the ALJ changed the exertion amounts to the occasional lifting of ten pounds and the frequent lifting of five pounds.  King testified that in that scenario,  the person would still be able to work as an order clerk, envelope addresser, and a sorter. (R. 936-937).

The  questions  posted  by  the  ALJ  improperly  assume  that  Tarpley  has  the  ability  to understand detailed instructions, concentrate and perform detailed tasks, and respond and adapt to workplace changes and supervision.  (R. 935, 937-938).  Tarpley's mental limitations are well-documented in the record.  Mental RFC's conducted in August and December 2004, found that Tarpley had limitations when it came to her ability to accept instructions, her ability to respond appropriately to criticism from supervisors, and her ability to respond appropriately to changes in the work setting.  (R. 449-450, 507).  Moreover, Tarpley's supervisor at the Turning Point, Gomez, testified at the administrative hearing that she had difficulty maintaining jobs that she was assigned during her stay at the Turning Point.  (R. 927-929).  Gomez, who had observed Tarpley for over a year at the Turning Point, testified that she would forget to lock doors, leave candles burning, hold kitchen trays unsteadily, and forget to put proper utensils in the silverware rolls.  Based on the two mental RFC's conducted in 2004 and Gomez' testimony, the ALJ's improperly framed the hypothetical to the VE that Tarpley could follow detailed instructions.

Only where the testimony by the vocational expert is based on a correct account of a claimant's qualifications and restrictions, may an ALJ properly rely on the vocational expert's testimony and conclusion. *See Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995). Unless there is evidence in the record to adequately support the assumptions made by the VE, the opinion expressed by the vocational expert is meaningless. *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). Here, the ALJ failed to formulate a hypothetical question to the vocational expert that incorporated Tarpley's mental limitations. Because the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden to show that despite Tarpley's impairments, she can perform her past relevant work. As such, the case must be remanded.

**III.**     ***Conclusion***

Accordingly, it is therefore

**ORDERED** that Tarpley's Motion for Summary Judgment (Docket Entry No. 16) is **GRANTED**. It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 17) is **DENIED**. It is further

**ORDERED** that the Commissioner's decision denying Tarpley's disability benefits is **REVERSED** and **REMANDED** pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to properly evaluate Tarpley's mental limitations under Listing 12.04 and to formulate Tarpley's RFC by taking into consideration all of her alleged mental limitations.

**SIGNED** at Houston, Texas on this 6th day of August, 2008.

Calvin Botley
United States Magistrate Judge